JOHN J. CONRAD v. ADELE DIEHL, GEORGE W. DIEHL and ALICE C. DIEHL, Appellants.—129 S. W. (2d) 870.

Division One, June 14, 1939.

812

*R. E. Kleinschmidt* for appellants.

814

*Schubel & Schubel* and *Edgar & Matthes* for respondent.

DALTON, C.—This is a proceeding in equity. By it the plaintiff seeks (1) to set aside several conveyances purporting to transfer title to certain real estate in Jefferson County to Alice C. Diehl; (2) to have George W. Diehl declared to be the owner thereof; and (3) to have said real estate subjected to the lien of plaintiff's judgments against George W. Diehl. The cause was instituted in Jefferson County, but on change of venue went to the Circuit Court of St. Francois County, where the relief prayed for was granted. Defendants have appealed.

The question for determination is who purchased and owns the real estate in question. The prior owner of the property was one Podhorsky. The conveyances involved are (1) a deed from Podhorsky and wife to Adele Diehl, a daughter of George W. Diehl; (2) a deed from Adele Diehl to William G. A. Dietzer, an alleged fictitious person; and (3) a conveyance from William G. A. Dietzer to Alice C. Diehl, wife of George W. Diehl. Mrs. Diehl was not a party to the original suit which was against Diehl, his daughter, and Dietzer. When the conveyance to Alice C. Diehl was recorded subsequent to the institution of the present suit, an amended petition was filed, and she was made a party defendant.

Plaintiff, a judgment creditor, contends that George W. Diehl, an otherwise insolvent debtor purchased and owns the real estate, and that the various conveyances were caused to be made by Diehl for the purpose of hindering, delaying and defrauding creditors, including plaintiff.

Defendant, George W. Diehl, handled all of the transactions herein mentioned. Defendants claim that he acted as agent for his wife, Alice C. Diehl, in purchasing the real estate and selling parts of it; that she paid the purchase price and paid her husband a commission for buying and selling the real estate for her; that Alice C. Diehl is the true owner of the property; and that the title was taken and held in the name of Adele Diehl and later, in the name of William G. A. Dietzer, as a matter of convenience; and that these parties are merely straw parties or trustees holding title for Mrs. Diehl and having no interest in the property.

This appeal raises no issues as to the sufficiency of the pleadings. All assignments of error are directed to the sufficiency of the evidence.

Error is assigned on account of (1) the Court's failure

to give defendants' instructions in the nature of demurrers to the evidence, as offered at the close of plaintiff's case, and at the close of all the evidence, (2) the Court's failure to dismiss plaintiff's bill, and (3) the Court's action in setting aside the several deeds and declaring title in George W. Diehl. Appellants' position is that there was *no evidence* that said Diehl owns the property, or furnished any of the purchase money, or had any deeds made to him or that any of the parties intended that title be vested in him. Appellants contend that there was *no evidence* that Alice C. Diehl, the wife, was guilty of any fraud, "fraudulent intent, conduct or purpose, either active or constructive," and that the wife's property could not be subjected to the payment of her husband's debts. Appellants contend further that even if the efforts of Diehl gave him an interest in the said property, he could legally prefer his wife as a creditor and have the title held for her benefit by a trustee or straw party. With reference to the last contention it is sufficient to say that the joint answer of the three Diehls expressly alleges "that the real estate described in said petition was acquired on or about the 19th day of July, 1933, by Alice C. Diehl, . . . as her individual property and with her own funds; . . . that the record title thereto was placed in the name of defendant Adele Diehl and afterwards in the name of defendant William G. A. Dietzer, a "straw party," as a mere conduit or medium for convenience in holding title." Defendants are bound by their said answer, and the position taken therein. The pleadings raise no issue as to Diehl's wife being a creditor or of any attempt by him to prefer her as such. The issues in a lawsuit are made up by the pleadings and not by anything else. [Kleinlein v. Foskin, 321 Mo. 887, 900, 13 S. W. (2d) 648, 654.]

At the close of plaintiff's case and again at the close of all of the evidence, the appellants tendered instructions in the nature of demurrers to the evidence, which were refused by the court. Appellants assign error thereon.

 The general rule is that error in the giving and refusing of instructions in an equity case is no error at all; for such instructions will not be considered on appeal. "A demurrer to the evidence being akin to a peremptory instruction, or an instruction in the nature of a demurrer, comes, we think, within the reason of the foregoing rule. It fills no such office in an equity case that error can be predicated on the mere giving or refusing of it." [Troll v. Spencer, 238 Mo. 81, 94, 141 S. W. 855, 858.] In the Troll case the question was fully considered, and the conclusion there reached has been adhered to. [Lee v. Lee, 258 Mo. 599, 605, 167 S. W. 1030, 1032; Nordquist v. Nordquist; 321 Mo. 1244, 1257, 14 S. W. (2d) 583, 588.] The assignment is overruled.

We shall consider the other assignments together since they require a consideration of the cause on its merits.

Plaintiff's evidence tended to show that George W. Diehl and Alice C. Diehl were husband and wife; that Adele Diehl was their daughter; that plaintiff was a brother-in-law of Diehl; that they resided in the same neighborhood in Jefferson County and had been acquainted for many years; that Mr. Diehl and his daughter were indebted to plaintiff for rent on premises in St. Louis; that notes were executed covering the rent and the debt extended back prior to July 19, 1933; that on or about March 5, 1934, plaintiff instituted certain suits in the justice court against George W. Diehl and Adele Diehl; that on March 12, 1934, plaintiff recovered a judgment against Adele Diehl for $105, on March 7, 1934, a judgment against George W. Diehl for $225, and on March 21, 1934, a judgment against both Mr. Diehl and his daughter for $500; that no part of the judgments had been paid; that George W. Diehl was a real estate agent and had been for many years; that his daughter Adele Diehl was a beauty parlor operator; that both had places of business in St. Louis in the same building; and that the daughter resided with her parents.

Plaintiff offered in evidence certified copies of conveyances of the real estate in question as follows (1) a warranty deed from Podhorsky and wife to Adele Diehl dated July 19, 1933, acknowledged on the same date, and recorded the following day. The deed shows $1.50 revenue stamps. (2) A warranty deed from Adele Diehl to William G. A. Dietzer dated March 1, 1934, consideration $100, acknowledged on the same date, and recorded March 8, 1934. (3) A warranty deed from William G. A. Dietzer to Alice C. Diehl dated March 1, 1934, consideration $1 acknowledged on the same date, and recorded June 26, 1935. The acknowledgment to each deed was taken before defendant, Diehl, a Notary Public.

Plaintiff testified that six or seven years prior to the trial, defendant, George W. Diehl told him that he (Diehl) always had his property in his wife's name or some other name so nobody could take it away from him; that a week or two before March 5, 1934, Diehl told him he had bought some land from Podhorsky, and as soon as he could sell it, he would pay plaintiff some money; that later Diehl sold off a couple of tracts and when plaintiff asked for money Diehl said he could not pay because he needed the money for an automobile. Plaintiff then reduced the notes to judgment.

C. A. Maxwell, a witness for plaintiff, testified that in 1933, the Podhorsky tract was worth $1500 to $2000; that he understood Diehl paid $1900 for it; that at the time of the trade for the Podhorsky tract Diehl told him that he (Diehl) was buying it; that he had a part of it sold; and that he had gotten an earnest money receipt from the owners.

Plaintiff called defendant, Adele Diehl, as a witness. She testified that she did not purchase the land in question from Podhorsky

and wife; that she did not know the parties; that she did not remember when she found out about the deal; that she did not know why title was placed in her name; that she knew she signed some papers, whatever her parents told her to sign; that she did not know to whom the deed was made or who took the acknowledgment; that at the time she signed the deed to Dietzer she had been served with summons in the suit by plaintiff; that she did not know why the deed was dated back; that she had signed papers before for her father and signed whatever he told her to sign. She testified that she never did have any interest in the Podhorsky property and never had any money to buy it.

Defendants to sustain the issues on their part called defendant George W. Diehl. On direct examination he testified with reference to the purchase of the property in question as follows: "Q. Did you buy the property at that time? A. No. Q. Did you arrange the transaction? A. Yes, I was the agent. Q. Whose money paid for it? A. Mrs. Diehl's. Q. How much did she pay? A. $1200 cash, and she gave a mortgage for the rest. Q. Was the mortgage since paid off? A. Yes. Q. How much of the money did you furnish? A. None. Q. How much did she furnish? A. All of it. Q. Where did she get it? A. Different sources—money she had. Q. Where did she get her money originally? A. She had some when we got married and through investments she made the rest."

Diehl then identified Exhibit T as the contract for the property and the original earnest money receipt made in the name of Dietzer. "Q. That is the original? A. The original earnest money receipt. Court: How much was it—earnest money? A. $50.00. Court: You say $50.00 earnest money was paid on the property? A. Yes, sir. Court: How was it paid? A. In cash. Court: You say afterwards $1200—that would be $1150 more—how was that paid? A. It was all paid in cash. Court: In actual currency? A. Yes, sir." Diehl further testified: "Q. Your wife didn't put up any money at the time the deal was made? A. Just the earnest money."

On cross-examination Diehl testified that at the time the property was purchased from Podhorsky there was a deed of trust on the property for $1000; that the property was sold subject to the deed of trust; and that no money was actually paid as earnest money. Diehl said, "I didn't pay anything; I always hold the earnest money until I complete the deal. I had them sign a receipt for $50.00. Q. $50.00 was actually paid? A. I held it. Q. What? A. I hold the earnest money until I get the title. Q. Did you ever pay Podhorsky $50.00? A. I never turned the earnest money over to the seller. Q. What did you do with it? A. I held it." It further developed on the examination of Diehl that he sold off one tract of the property to Mr. Gershman, one to Mr. Shellenberg and

one to Mr. Patton. He testified, ''Q. Who got the money from them? A. I gave it to Mrs. Diehl.''

On cross-examination with reference to payments to Podhorsky, Diehl was asked: ''Q. At the time the deed was made, how much did you pay him? A. $1200.'' Diehl later testified that this particular payment to Podhorsky was handled through the Building and Loan at St. Charles when the deal was closed with Mr. Gershman (a person who purchased a part of the tract) and that he (Diehl) was not sure whether he used his wife's money or merely used the check received from Mr. Gershman. It appears that Diehl made a contract to sell ten acres to Gershman before he made the contract to buy the land from Podhorsky. He testified, ''Just how it was turned over I couldn't say—whether I turned over the check instead of cash or not—I couldn't say that.'' It later appeared from defendant, Diehl's testimony that this particular money was not in fact paid over to Podhorsky at all, but was used to pay off the deed of trust against the Podhorsky property—being $1000 principal, certain interest and the taxes. Defendant later said, ''I paid the deed of trust off and the taxes, and whatever was against it, and gave Podhorsky the difference.'' ''Q. How much did you actually pay him at the time the deed was made? A. It wasn't much; a very little sum. I remember it just worked out almost by the time we added the taxes, back interest and principal—a very small sum.'' It further developed from Diehl's testimony that the purchase price to Podhorsky over and above the deed of trust existing against the property was covered by the execution of a deed of trust for $600; that it was given to Podhorsky and was executed by Adele Diehl. Defendant Diehl claimed that later this deed of trust was paid off; that he got the money from Mrs. Diehl; that she had the money in the house at home; that she usually kept her money with her wherever she went; that sometimes she kept it in his safe, but that she had the habit of carrying most all the money she had with her.

With reference to the sale of part of this property Diehl testified: ''Q. Did your wife sell off any of this after she bought it? A. I sold it for her. Q. To whom? I sold one tract to Mr. Gershman, one to Mr. Shellenberg, and one to Mr. Patton.'' Diehl testified that it was his idea to put title in his daughter's name; that he originally bought the property in Dietzer's name, but took the deed in the daughter's name; that the daughter had no interest in the property; that he was acting for his wife. As reasons for changing the title from Adele Diehl to Dietzer, defendant Diehl, testified: ''We had sold two tracts we hadn't delivered the deeds to and we were going to transfer them. They had paid in enough to give them a deed and we thought it better to transfer it to Dietzer because it was handy at the time and the deed wouldn't be made from one of our family. We transferred it to Dietzer and had him trans-

fer deeds to these people and one to Mrs. Diehl. Q. Was that dated on the date it bears? A. They were all made on the same day. Q. You got a deed from Dietzer to your wife at the same time your daughter transferred it to Dietzer? A. Yes, sir. Q. What was the purpose? A. We wanted to transfer two tracts to Patton and Shellenberg, and we thought we would just transfer it all at once."

It later developed from Diehl's testimony that the deed executed by Dietzer was not to Mrs. Diehl but was in fact in blank (that is, the deed was signed without the second party's name in it) and that her name was later filled in. Diehl testified, "I had Dietzer make deeds to all of it when we cut it up. He signed 3 or 4 deeds at the time to different parties that had bought. Q. This deed from Dietzer to Mrs. Diehl is dated March 1, 1934? A. Yes, sir. Q. Can you tell why you waited until June 26, 1935 to record it? A. I thought if I sold it during that time I could always fill the buyer's name in instead of Mrs. Diehl's." He later said: "We left it blank because if we sold it sometime after he signed the blank deed we wouldn't have needed her name on it. We could have used the purchaser's name. Q. Why did you finally decide to record it? A. I held it so long I figured I had better record it—that I might as well file it in her name." Diehl testified that at the time of the purchase from Podhorsky that Dietzer "was supposed to be the actual buyer as far as the owner was concerned," but that he (Diehl) sold it to Mrs. Diehl and that after title was taken in the name of Adele Diehl he (Diehl) wanted the title transferred to Dietzer because "I hadn't told the people buying it that any Diehl owned the property and I didn't want her to sign the deeds."

Diehl admitted that he had quit taking title in his own name in 1926. "Q. How long has it been since you quit taking title to real estate in your own name? A. I don't know, back in 1926, I think." He admitted that the judgments in favor of plaintiff were unpaid; that part of the original debt might have been past due when the Podhorsky deal was made; that the property (on which the rent accrued, for which the notes were given and on which plaintiff's judgments were based) was formerly owned by him but held in the name of Dietzer. He denied the various conversations with plaintiff and witness Maxwell.

Defendant Alice C. Diehl testified that she bought the real estate in question; that she gave her husband the money to buy it with to-wit, $1200 in currency; that she had been carrying the currency on her person; that Diehl told her about the property; that she told him to go ahead and buy it; that she had a little over $1000 at home at the time; that her money went into the purchase of the Podhorsky property; that later her husband sold off some of it and gave her the money, how much or when, she could not recall; that

she told her husband to buy, sell and speculate on her property; that she knew the Podhorsky property was to be put in some one else's name and that she consented to it; that she gave her husband permission to do whatever he thought was best; that she knew there was a mortgage on the Podhorsky property; that she did not know how the deal was handled or what amount was paid; she said she trusted her husband and that he knew more about it than she did.

There was much testimony in the record to the effect that Mrs. Diehl did own and had owned property; that in 1926 she received from her parents a two family flat, a store and two tenements, which she still owned; that she had $1000 when she married; that she bought a house in 1918 and traded it off; that she had obtained other funds from her parents; and that she owned some oil stocks and Mexican Railroad stocks.

Diehl testified to having made various real estate deals for his wife. Deeds were offered in evidence showing conveyances to Mrs. Diehl in 1921, 1926, and 1930, 1934. There was evidence of a deed of trust taken in her favor in 1925 and also deeds in which Diehl and his wife joined in transferring her property in 1930. There were conveyances in evidence wherein William G. A. Dietzer appeared as a party and the testimony of Mr. Diehl indicated that some of this property was held for Mrs. Diehl. In two cases where the title was taken in the name of Dietzer, the property was owned by Diehl. This property being acquired in 1930 and 1931. Defendants offered in evidence bank deposit slips and receipts for bonds showing Mrs. Diehl as owner.

It appeared from the cross-examination of Mrs. Diehl that she lost her home by foreclosure about 1932, and also lost other real estate in St. Louis County in 1933. She claimed she had money, but the mortgages were too much to pay off.

There is considerable testimony in the record as to the existence or non-existence of William G. A. Dietzer. The petition charged that plaintiff believed him to be "a fictitious person that does not exist and never existed." Dietzer was served by publication, but made no appearance. Plaintiff testified that he had looked and inquired for Dietzer 4½ year and had never seen him or been able to locate him and that he was not listed in the St. Louis City directory. The Diehls on the other hand testified as to his existence, claimed that he had lived at a rooming house in St. Louis, but had now gone to Arizona. The testimony as to his actual existence was far from satisfactory.

We have undertaken to state the evidence rather fully. Upon the foregoing evidence the trial court found that George W. Diehl purchased the real estate from Podhorsky; that at the time Diehl was indebted to plaintiff; that for the purpose of hindering, delaying and defrauding plaintiff, Diehl caused the several conveyances

to be made; that none of the several grantees furnished any of the consideration; that no consideration passed between the grantee and grantor in any of the respective deeds; that defendant Alice C. Diehl knew of the various conveyances and of their purpose.

Since this is an equity case we are not bound by the Chancellor's findings, but will review the evidence and reach our own conclusions as to its weight and value. "However, where there is conflicting verbal testimony, involving credibility of witnesses who have appeared before the Chancellor, this court will usually defer to his findings unless satisfied that they are against the weight of the evidence." [Fessler v. Fessler, 332 Mo. 655, 670, 60 S. W. (2d) 17, 23.] In this case the charge is fraud. The Chancellor was in a better position to see and observe the witnesses, hear their testimony and determine their credibility. Appellants contend that the rule giving deference to the findings of the trial Chancellor should not apply to this case and insist that much of the evidence in this case is documentary. Appellants say that the rule properly applies where there is conflict of verbal testimony involving credibility of witnesses who have appeared before the Chancellor. [Shaw v. Butler (Mo.), 78 S. W. (2d) 420, 421; Reaves v. Pierce (Mo.), 26 S. W. (2d) 611, 616.] We agree that "the rule is applied mainly when oral evidence is *conflicting.*" [Smith v. Lore, 325 Mo. 282, 293, 29 S. W. (2d) 91, 96.]

The documentary evidence in this case is not decisive. The issues of the case must be decided from facts and circumstances resting in parol and the inferences to be drawn from these facts. In determining the facts in this case we may properly look for guidance to the findings of fact by the trial Judge "in so far as they are pure findings of fact interpreting the testimony in the light of the trial atmosphere, the attitude of the witnesses, their capacities and their disposition to tell the truth." [Reaves v. Pierce (Mo.), 26 S. W. (2d) 611, 616.]

The credibility of the witnesses is particularly important in this case. The rule giving deference to the findings of the Chancellor should and does apply.

■ Appellants contend that fraud is never presumed nor deduced from mere suspicion, but must be proved and the burden of proving a conveyance to be fraudulent rests upon him who alleges it. [Moberly v. Watson, 340 Mo. 820, 102 S. W. (2d) 886.] Fraud, however, does not need to be proven by direct evidence. It may be established by circumstances. A court may draw a conclusion of fraud from other facts and from inferences drawn from such facts. [Castorina v. Herrmann, 340 Mo. 1026, 1035, 104 S. W. (2d) 297, 302.]

■ There are many circumstances in this case which cause a court to view all of the transactions with scrutiny, if not suspicion.

The badges of fraud are numerous. It is immaterial that many of these circumstances are disclosed by the evidence of the defendants. [Castorina v. Herrmann, supra.] Defendants contend that George W. Diehl was the agent of his wife; that he purchased the property for her; that he had no intention to take title in his own name. The record shows he handled all of the transactions from the contract of purchase down to and including filling in his wife's name in the blank deed signed by Dietzer, and thereafter filing this deed for record. The rule in this State is that "transactions between husband and wife to the prejudice of the husband's creditors are looked upon with suspicion, 'and their good faith must be so clearly shown that there can be no reasonable doubt of the honesty of the transactions.'" [Friedel v. Bailey, 329 Mo. 22, 30, 44 S. W. (2d) 9, 11.] If Diehl acted for his wife the evidence of it was in his mind. There was no record or documentary evidence of her interest until after the filing of the present suit.

The alleged ownership of Mrs. Diehl was at all times concealed until after the record owner was made a party to this suit. The method used in shifting title from one to another and without consideration indicates that the business was not being handled in the usual and ordinary course. This indicates fraud. "Recognized indicia or badges of fraud include fictitious consideration, false statements as to consideration, transactions different from the usual method of doing business, transfer of all of a debtor's property, insolvency, confidential relationship of the parties, and transfers in anticipation of suit or execution. None of these things alone prove fraud, but they do warrant an inference of fraud, especially where there is a concurrence of so many of these badges." [Hendrix v. Goldman (Mo.), 92 S. W. (2d) 733, 736.]

It is conceded in the pleadings and by the evidence that the title to the real estate in question was being carried in the names of straw parties, with the intent and purpose to conceal the true ownership, while at all times defendant Diehl was completely in control of the property. These circumstances indicate fraud. "Real estate transactions made through straw men and ghosts should always be viewed with suspicion." [Ryan v. Stubblefield (Mo.), 100 S. W. (2d) 444, 446.]

The petition charged that Dietzer was a fictitious person and in effect an invention of Diehl. Dietzer could not be found. Although served by publication, he failed to appear. Defendants failed to offer satisfactory proof that he had ever existed in fact. Even on their own testimony he remains more or less a shadow. The presumption is that if they could have possibly shown his existence by disinterested witnesses that they would have done so. [27 C. J. 494, sec. 148.]

Title was transferred after plaintiff instituted suit on the

notes. There is evidence that the deed was dated back. After this suit was instituted title was again transferred. The deed by which title was placed in Mrs. Diehl was withheld from record and filed after this suit was instituted. Her name was inserted in the bank deed long after its execution. All of these circumstances indicated a fraudulent intent and purpose. [Castorina v. Herrmann, supra.]

We think that it satisfactorily appears from the evidence that the real estate in question was purchased by George W. Diehl for his own use and benefit; that he is the true owner; that no funds of Mrs. Diehl were used therein; that it was through his efforts that the property was purchased and parts sold off, so that these funds could be applied to the purchase price of the property. We defer to the findings of the trial Chancellor and find that none of the grantees named in the several deeds furnished any consideration whatsoever.

The transfer of title to Mrs. Diehl after the institution of the present suit being voluntary and without consideration was presumptively fraudulent and void as to existing creditors. If the transfer from Diehl to his wife did not render Diehl insolvent the burden was on defendants to plead and prove that fact. [Clark v. Thias, 173 Mo. 628, 652, 73 S. W. 616, 622.] It was conceded that Diehl had no other property. "It is settled law that a voluntary conveyance of property is presumptively fraudulent and void as to existing creditors. When such facts are shown, the burden rests on the grantee or donee to establish facts showing such conveyance to be valid." [Godchaux Sugars v. Quinn (Mo.), 95 S. W. (2d) 82, 83; Scharff v. McGaugh, 205 Mo. 344, 103 S. W. 550.]

Appellants contend, however, that Mrs. Diehl was not a party to any fraudulent conduct, and that there is no evidence of any fraudulent intent, conduct or purpose, either actual or constructive, on her part. However, having arrived at the conclusion that the property in question was purchased and owned by defendant George W. Diehl, it is immaterial whether Mrs. Diehl was guilty of actual fraud or not.

In the case of Godchaux Sugars v. Quinn, supra, defendant Quinn, being indebted to plaintiff purchased certain lands from one Dougherty, and requested him to make the deed to defendant LeCompte. All of the negotiations looking to the purchase of the land were carried on between Dougherty and Quinn. The arrangements for the payment of the purchase price as well as the payment thereof were made by Quinn. At the request of Quinn the land was deeded to LeCompte without any consideration whatever moving from LeCompte to Quinn or anyone else. In that case it was contended that the petition failed to charge that the grantee, LeCompte knew of Quinn's indebtedness to plaintiff or that he had perpetrated a fraud on plaintiff. The Court said: "If the conveyance was voluntary, it was presumptively fraudulent as to existing creditors, regardless of actual fraud, if

any. It was therefore not necessary for the petition to allege that LeCompte knew of Quinn's indebtedness to plaintiff, or that he by acts of omission or commission perpetrated a fraud on plaintiff.". Since this property belongs to the husband the actual fraud of the wife, if any, is immaterial.

In the Godchaux Sugars case the agency contention was also made. The Court said: "Further contention is made (1) that, although Quinn paid for the land, he might have done so as the agent of Le-Compte, and (2) that, if it be assumed that Quinn furnished the purchase money, plaintiff could not recover without showing that the money was subject to execution.

"The trouble with both contentions is that plaintiff's showing, prima facie, that it was an existing creditor of defendants, and that the conveyance to LeCompte was voluntary and without consideration, condemned the conveyance as fraudulent and void, and cast the burden on defendants to show otherwise, which burden defendants failed to carry." The same rule applies in this and we so hold.

Appellants called our attention to cases holding that the wife's property may not be taken for the debts of her husband and that lands purchased by the husband with funds of his wife, remain her property, even though he may take title in his own name. Our attention is called to the following cases: Alkire Grocer Co. v. Ballenger, 137 Mo. 369, 39 S. W. 911; Seay v. Hesse, 123 Mo. 450, 24 S. W. 1017; Blake v. Meadows, 225 Mo. 1, 123 S. W. 868; First National Bank v. Link (Mo.), 275 S. W. 936; Leidner Undertaking Co. v. Vogel (Mo. App.), 251 S. W. 428, l. c. 431; Green v. Wilks (Mo.), 109 S. W. (2d) 859.

We have held that the property was purchased and owned by George W. Diehl and that no funds of the wife were invested therein. If this real estate is not the wife's property and was not purchased with her funds, she cannot complain that her property is being taken for her husband's debts. The contention is overruled.

Our conclusion is that the findings of the trial court were correct. We find no sufficient reason for reaching a different conclusion. The judgment is accordingly affirmed. *Hyde* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur, except *Hays, P. J.*, absent.